```
                    IN THE UNITED STATES DISTRICT COURT
1                  FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
2
    UNITED STATES OF AMERICA,    )    Case No. 3:19-cr-00521-X-1
3                                )
            Plaintiff,           )
4                                )    Dallas, Texas
    v.                           )    October 11, 2019
5                                )    12:15 p.m.
    BETH ELLEN DEGROOT,          )
6                                )    DETENTION HEARING
            Defendant.           )
7   _____ )

8                       TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE RENEE HARRIS TOLIVER,
9                    UNITED STATES MAGISTRATE JUDGE.

10  APPEARANCES:

11

12  For the Government:          Christopher Fenton
                                 William Henry Bowne, III
13                               U.S. DEPARTMENT OF JUSTICE
                                 1400 New York Avenue NW
14                               Bond Building
                                 Washington, DC  20530
15                               (202) 320-0539

16  For the Government:          Mary F. Walters
                                 UNITED STATES ATTORNEY'S OFFICE
17                               1100 Commerce Street, Third Floor
                                 Dallas, TX  75242-1699
18                               (214) 659-8600

19  For the Defendant:           Ryne Thomas Sandel
                                 WHALEN LAW OFFICE
20                               9300 John Hickman Parkway,
                                   Suite 501
21                               Frisco, TX  75035
                                 (214) 368-2560

22  Court Recorder:              Jane W. Amerson
                                 UNITED STATES DISTRICT COURT
23                               1100 Commerce Street, Room 1611
                                 Dallas, TX  75242-1003
24                               (214) 753-2360

25
```

1    Transcription Service:        Kathy Rehling
                                   311 Paradise Cove
2                                  Shady Shores, TX  76208
                                   (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25           Proceedings recorded by electronic sound recording;
                transcript produced by transcription service.

1      <u>DALLAS, TEXAS - OCTOBER 11, 2019 - 1:57 P.M.</u>

2          THE COURT:  Please be seated.  The Court calls for

3  detention hearing Case No. 3:19-cr-521-X, United States of

4  America versus Beth Ellen DeGroot.

5          MR. FENTON:  Good afternoon, Your Honor.  Christopher

6  Fenton, Bill Bowne, and Mary Walters for the United States.

7          THE COURT:  Good afternoon.

8          MR. SANDEL:  Ryne Sandel for Ms. DeGroot, Your Honor.

9          THE COURT:  Good afternoon.  And Mr. Sandel, I

10 noticed that you filed your entry of appearance of counsel

11 today.

12         MR. SANDEL:  That's correct, Your Honor.

13         THE COURT:  Okay.

14         MR. SANDEL:  I'm James Whalen's associate, who had

15 previously filed an entry of appearance.

16         THE COURT:  And are you ready to proceed on behalf of

17 Ms. DeGroot?

18         MR. SANDEL:  I am, Your Honor.

19         THE COURT:  Is the Government ready?

20         MR. FENTON:  Yes, Your Honor.

21         THE COURT:  Then you may call your first witness.

22         MR. FENTON:  Thank you, Your Honor.  The Government

23 calls Inspector Anna Hallstrom.

24         THE CLERK:  Please raise your right hand.

25          ANNA HALLSTROM, GOVERNMENT'S WITNESS, SWORN

1          THE CLERK:  Have a seat, please.  And if you could

2      state your name and spell it for the record.

3          THE WITNESS:  Anna Hallstrom.  H-A-L-L-S-T-R-O-M.

4                      DIRECT EXAMINATION

5    BY MR. FENTON:

6    Q    Inspector Hallstrom, where do you work and what is your

7    title?

8    A    I'm a Postal Inspector with the U.S. Postal Inspection

9    Service in Washington, DC.

10   Q    And do part of your duties as a postal inspector include

11   investigating the crimes alleged in the indictment?

12   A    Yes.

13   Q    And have you received training with respect to executing

14   those duties?

15   A    Yes.

16   Q    What kind of training?

17   A    I've received on-the-job training, and I also have

18   received a master's in economic crime management and a

19   bachelor's degree as well.

20   Q    Does the information you're about to provide constitute

21   all of the evidence that the Government has in this case?

22   A    No.

23   Q    At some point, did you become involved in an investigation

24   of a company called EarthWater?

25   A    Yes.

1    Q    Please tell the Court about that investigation.

2    A    It's a high-yield investment scheme investigation where

3    elderly victims were investing in securities for EarthWater,

4    and the money that they were investing was supposed to be for

5    stocks but the majority of it went to the owners for personal

6    expenses.

7    Q    For their own personal benefit?

8    A    Correct.

9    Q    Who is Harley E. Barnes, III?

10   A    He's the Chief Financial Officer of EarthWater.

11   Q    And was he among the Defendants charged?

12   A    Yes.

13   Q    And what was his role in the fraud?

14   A    He controlled the bank accounts.  So he was controlling

15   over the victims' money and where it went.

16   Q    And did he distribute the criminal proceeds to the other

17   Defendants?

18   A    Yes.

19   Q    Was Mr. Barnes arrested?

20   A    Yes.

21   Q    When was that?

22   A    On May 6, 2019.

23   Q    Okay.  And was he released subject to conditions?

24   A    Yes.

25   Q    What were those conditions?

1    A    He was not to have contact with any of the other

2    codefendants, witnesses, or victims in the case.  And he was

3    also not supposed to be in the sale or promotion of any

4    securities.  Or advice in securities.

5    Q    Did Mr. Barnes abide by those conditions?

6    A    No.

7    Q    How did he violate them?

8    A    He -- immediately after being released from his initial

9    arrest, he had Ms. Ellen -- Beth Ellen DeGroot set up a new

10   phone number for him, and he also set up a new e-mail address

11   called masterplan150@gmail.com, and he began communicating

12   with witnesses and victims and created a new plan going

13   forward.

14   Q    Did Ms. DeGroot play any other role with respect to

15   facilitating those communications?

16   A    Yes.  She was instructed to be the intermediary between

17   Barnes and the witnesses and victims because he was not

18   supposed to talk to them and they were aware of that.

19   Q    All right.  Directing your attention to the document

20   marked as Government's Exhibit 1, do you recognize this

21   document?

22   A    Yes.

23   Q    What is it?

24   A    It is the subscriber information from AT&T for a phone

25   number ending 3161.

Hallstrom - Direct                    7

1          MR. FENTON:  At this time, the Government moves to --

2     moves the document marked Government Exhibit 1 into evidence.

3          MR. SANDEL:  No objection, Your Honor.

4          THE COURT:  It's admitted.

5       (Government's Exhibit 1 is received into evidence.)

6     BY MR. FENTON:

7     Q    What does this document show?

8     A    It shows that the phone number ending 3161 was signed up

9     or registered under the name Beth DeGroot.

10    Q    On what date?

11    A    On May 7, 2019.

12    Q    And is that the day after Mr. Barnes was arrested and then

13    subsequently released?

14    A    Yes.

15    Q    Now, based on your investigation to date, did Ms. DeGroot

16    actually use this telephone?

17    A    No.

18    Q    Who actually used this telephone?

19    A    Barnes did.

20    Q    Okay.  Directing your attention to the document marked

21    Government Exhibit 2, do you recognize this document?

22    A    Yes.

23    Q    What is this?

24    A    This is subscriber information from Google for the e-mail

25    address masterplan150@gmail.com.

1          MR. FENTON:  The Government moves the document marked

2     Government Exhibit 2 into evidence.

3          MR. SANDEL:  No objection, Your Honor.

4          THE COURT:  It's admitted.

5     (Government's Exhibit 2 is received into evidence.)

6     BY MR. FENTON:

7     Q    What does this document show, Inspector?

8     A    It shows that the name registered for this e-mail address

9     was Buddy Barnes, which was an alias for Harley Barnes.  And

10    it shows that the phone number associated with this e-mail

11    address is the same one ending 3161.

12    Q    The one that Ms. DeGroot had purchased on May 7th?

13    A    Correct.

14    Q    Directing your attention to the document marked Government

15    Exhibit 3, do you recognize this document?

16    A    Yes.

17    Q    What is it?

18    A    This is the subscriber details for Oath, which is also

19    Yahoo, showing an e-mail address tristargroupllc.

20         MR. FENTON:  The Government moves to admit the

21    document marked Government Exhibit 3 into evidence.

22         MR. SANDEL:  No objection, Your Honor.

23         THE COURT:  It's admitted.

24    (Government's Exhibit 3 is received into evidence.)

25    BY MR. FENTON:

1   Q    What does this document show?

2   A    It shows us this e-mail address was created for Beth

3   DeGroot on May 10, 2019.

4   Q    Okay.  So, in the same week after Mr. Barnes is released

5   from jail, he obtains a new phone from Ms. DeGroot, correct?

6   A    Yes.

7   Q    He opened -- creates a new e-mail address, correct?

8   A    Yes.

9   Q    And Ms. DeGroot also creates a new e-mail address as well,

10  correct?

11  A    Yes.

12  Q    Now, in the course of your investigation, did you learn

13  why these e-mails were created?

14  A    Because they were instructing the witnesses and victims

15  that they were contacting that the EarthWater e-mails had been

16  compromised and that they were no longer using them.

17  Q    All right.  Directing your attention to the document

18  marked as Government Exhibit 4, do you recognize this

19  document?

20  A    Yes.

21  Q    What --

22            THE COURT:  Let me stop you there.  Are you going to

23  offer all the exhibits in the book that you --

24            MR. FENTON:  Yes.

25            THE COURT:  -- provided me?  Do you have --

Hallstrom - Direct                          10

1          MR. SANDEL:  And I'll have no objection, Your Honor.

2          THE COURT:  -- any objection?  They're all admitted.

3          MR. FENTON:  Okay.

4          THE COURT:  That doesn't mean you can't discuss them.

5    I'm just kind of trying to shortcut this a little bit.

6          (Government's Exhibits received into evidence.)

7    BY MR. FENTON:

8    Q    All right.  So let's look at Government Exhibit 4.  What

9    does this show?

10   A    It's an e-mail chain between Beth DeGroot and Toni Bates,

11   who was the client account manager for Resourcing Edge, the

12   payroll company for EarthWater.

13   Q    And to who -- to what address was the initial e-mail sent?

14   A    The initial e-mail was sent to beth@earthwater.com.

15   Q    And did Ms. DeGroot provide any direction as to how to

16   contact her?

17   A    Yes.  She instructed Toni Bates that she no longer uses

18   that e-mail address and to use tristargroupllc@yahoo.com.

19   Q    Okay.  Did Ms. DeGroot -- in this e-mail chain, did Ms.

20   DeGroot provide any directions with respect to contacting Mr.

21   Barnes?

22   A    She said not to contact him because he's only using a

23   personal e-mail account and she'll be forwarding -- Beth

24   DeGroot will be forwarding all e-mails to him because they are

25   watching his e-mails.

1   Q    Because they are watching his e-mails?

2   A    Yes.

3   Q    All right.  Let's go on next to Government Exhibit 5.  Can

4   you tell us what this is?

5   A    This is an e-mail from Beth DeGroot to Jim Jensen.  And it

6   is discussing that the EarthWater e-mails had been compromised

7   and to not use those e-mail addresses anymore and also to not

8   include Barnes in any e-mails regarding selling, advising, or

9   promoting securities.

10  Q    All right.  Who is Jim Jensen?

11  A    Jim Jensen was a victim in this case.

12  Q    And how much money did Mr. Jensen lose?

13  A    $150,000.

14  Q    And how old is Mr. Jensen?

15  A    He's 78 years old.

16  Q    Now, when Ms. DeGroot contacted Mr. Jensen, what e-mail

17  address did she use?

18  A    tristargroupllc@yahoo.com.

19  Q    And was Mr. Barnes copied?

20  A    Yes.

21  Q    What e-mail address did Mr. Barnes use?

22  A    masterplan150@gmail.com.

23  Q    All right.  Let's move on next to Government Exhibit #6.

24  Can you tell us what this document is?

25  A    This is a text message from Barnes to Jonathon Koster.

1   Q    Okay.  And what -- what does this text show?

2   A    It was instructing Mr. Koster to go through Beth DeGroot

3   as a trusted intermediary.

4   Q    Okay.  Can you just read to the Court the relevant

5   passage?

6   A    Sure.  It gives Beth DeGroot's phone number.  "Text or

7   call.  She is our VP, shareholder, very trusted by me, CJ,

8   Larry Friedman, et cetera, and can guide you through helping

9   me out personally.  I will give you her number as well.

10  Thanks again.  My personal accounts are subject to

11  forfeiture."

12  Q    Okay.  So let's stop there for a moment.  Did there come a

13  time where Ms. DeGroot opened a bank account at Happy State

14  Bank?

15  A    Yes.

16  Q    And did any postal inspectors speak with an employee for

17  Happy State Bank about that bank account?

18  A    Yes.

19  Q    What did they learn?

20  A    They learned that Ms. DeGroot came in to Happy State Bank

21  to try to open a business checking account for Tristar

22  Marketing, but the documentation that she had for that

23  business only showed that Harley Barnes was the owner of the

24  account.  So they called Harley Barnes down to the bank to

25  discuss it, because he would have to be the signatory on the

1    account and she could have been added as an authorized signer.

2    But they did not want that.  They wanted Ms. DeGroot to be the

3    only signer on the account.  So instead of opening a business

4    account, she opened up a personal checking account in her name

5    only.

6    Q    Okay.  Let's move on to Government Exhibit 7.  Can you

7    tell us what this is?

8    A    This is an e-mail from Ms. DeGroot to Jonathan Koster

9    saying -- just thanking him for his help and also informing

10   him that Barnes was restricted from talking about certain

11   things.

12   Q    Okay.  And did Ms. DeGroot indicate how he should

13   communicate with Mr. Barnes?

14   A    To go through her.

15   Q    Okay.  Let's look at Government Exhibit 8.  Did Mr. Barnes

16   ever direct his own personal funds into Ms. DeGroot's Happy

17   State Bank account?

18   A    Yes.

19   Q    Okay.  So directing your attention to Government Exhibit

20   8, can you tell us what does this document show?

21   A    This is an audit trail or an audit report from Resourcing

22   Edge, the payroll company, that shows it was Barnes' User ID

23   that went into it to change the account number of where his

24   direct deposit was to go, which was Ms. DeGroot's account at

25   Happy State Bank.

1    Q    And on what date did that happen?

2    A    May 16, 2019.

3    Q    And was that the day after they opened the bank account at

4    Happy State Bank?

5    A    Yes.

6    Q    Okay.  Let's next turn to Government Exhibit 9.  What does

7    this document show?  Well, can you tell us what is this

8    document?

9    A    It is a bank statement from Happy State Bank for Ms.

10   DeGroot's account there.

11   Q    And what does this show?

12   A    It shows, on May 21st, a Resourcing Edge payroll in the

13   name of Harley Barnes, III for $3,106.26.

14   Q    Okay.  So not only did Mr. Barnes actually direct his

15   payroll checks into the Happy State Bank account, but they

16   were actually deposited there, or at least one was?

17   A    Yes.

18   Q    Okay.  Did there come a time when Ms. DeGroot received a

19   grand jury subpoena?

20   A    Yes.

21   Q    And when was that?

22   A    In June 2019.

23   Q    How many e-mails did she produce in response to that grand

24   jury subpoena?

25   A    She produced four e-mails.

1    Q    Okay.  And how many e-mails did she produce in which she

2    was either an author or a recipient?

3    A    One.

4    Q    Directing your attention to Government Exhibit 10, do you

5    recognize this document?

6    A    Yes.

7    Q    Okay.  Can you tell us what it is?

8    A    It is a PDF of an e-mail that Ms. DeGroot had submitted as

9    the sole e-mail that she was in on for that was part of the

10   subpoena response.

11   Q    Okay.  So this is the only e-mail in which she was an

12   author or recipient that she produced in response to the grand

13   jury subpoena?

14   A    Correct.

15   Q    Did you compare this document against other documents

16   produced by other parties?

17   A    Yes.

18   Q    Specifically, did you compare this against Government

19   Exhibit 5?

20   A    Yes.

21   Q    Okay.  And what did you find?

22   A    With this document, the -- when you look at it through

23   Adobe, the properties of the document showed that it was

24   created from a Word document, meaning that she took the e-

25   mail, the original e-mail, copied and pasted it into a Word

1   document, and altered who it was from and who it was to by

2   removing Barnes' name, and also deleted a couple sentences

3   from it.  And it hid what the actual e-mail addresses were

4   that it was coming from.

5   Q    Okay.  So she also -- she deleted Mr. Barnes' name from cc

6   line?

7   A    Yes.

8   Q    And then she also deleted sentences from the actual e-mail

9   itself?

10  A    Yes.

11  Q    And she also then concealed all of the e-mail -- the

12  metadata for the e-mail addresses?

13  A    Correct.

14  Q    Okay.  What was the effect of altering this document?

15  A    To hide to the grand jury that there was new e-mail

16  addresses that were created that were used to contact victims

17  and witnesses.

18  Q    All right.  Let's take a look at Government Exhibit 11.

19  Can you tell us what this document is?

20  A    This is the -- an original document from Jim Jensen to

21  Beth DeGroot showing the same e-mail address but that had the

22  included e-mail addresses that were used in it and also the

23  sentences that had been omitted from the document that she

24  produced as part of the grand jury -- or, the subpoena.

25  Q    All right.  So, after reading with these documents, does

1   this confirm your finding that Ms. DeGroot altered the

2   document?

3   A    Yes.

4   Q    Based on your training and experience, and on the

5   investigation to date, do you believe that there is a serious

6   risk Ms. DeGroot will continue to obstruct justice?

7   A    Yes.

8   Q    Why?

9   A    Because she has shown that she has already altered -- is

10  willing to alter documents and also create documents in order

11  to hide activities from the grand jury.

12  Q    All right.  Let's move on to Government Exhibit 12.  Can

13  you tell us what this is?

14  A    This is payroll information from Resourcing Edge for

15  Harley Barnes, Beth DeGroot, and Brittany Bell (phonetic).

16  Q    Okay.  And who is Brittany Bell?

17  A    Ms. DeGroot's daughter.

18  Q    All right.  So was she on the payroll of EarthWater as

19  well?

20  A    Yes.

21  Q    Does this report document Ms. DeGroot's effort to get

22  EarthWater's payroll processor to release paychecks to her?

23  A    Yes.

24  Q    Okay.  What does it show?

25  A    It shows, on dates after the arrest and the seizure of the

1   accounts of EarthWater, that she initiated payroll to try to

2   get two different payrolls submitted so that she could get

3   money for her and Barnes out of the account.

4   Q    And approximately how much money did she try to get?

5   A    Approximately $40,000.

6   Q    Okay.  At this point in time, did EarthWater have any

7   money to cover the payroll?

8   A    No.

9   Q    Why not?

10  A    Because the bank accounts had been seized.

11  Q    Did you have a conversation with anyone who worked at

12  Resourcing Edge?

13  A    Yes.

14  Q    Okay.  Tell us about that conversation.

15  A    We interviewed Toni Bates, who was the client account

16  manager, and she let us know that Ms. DeGroot had never

17  informed Resourcing Edge that the accounts had been seized.

18  It was business as usual.

19  Q    Okay.  Was Ms. Bates' understanding that Ms. DeGroot was

20  supposed to inform her if the company executives were indicted

21  or if the bank accounts were frozen?

22  A    Yes.

23  Q    And she failed to do so?

24  A    Correct.

25  Q    Did she have any conversations with Resourcing Edge around

1  that time?  Did Ms. DeGroot have any conversations with the

2  Resourcing Edge employees?

3  A    Yes.  She had informed them that she had been promoted to

4  president of EarthWater, and after the first payroll was

5  released and it was returned for insufficient funds, she had

6  filled out documentation and told them that there was a

7  different EarthWater account that they could have pulled money

8  from.

9  Q    Okay.  And was that true?

10  A    No.

11  Q    Why not?

12  A    Because that second account that they were using had also

13  been frozen as well.

14  Q    Tell us a little bit about that second account.  What

15  account was that?

16  A    It was an investment account where victim money had been

17  going into.

18  Q    Okay.  And the form that you're referring to, let's just

19  turn to Government Exhibit 19.  Just skip a little bit.  Is

20  this the form that you just referenced?

21  A    Yes.

22  Q    Okay.  So this form here is dated what?

23  A    May 23, 2019.

24  Q    And it's signed by whom?

25  A    Beth DeGroot.

1   Q    And when were EarthWater's bank accounts frozen?

2   A    May 6, 2019.

3   Q    Okay.  So this was submitted nearly two weeks after the

4   bank accounts had been frozen?

5   A    Yes.

6   Q    And is there evidence to suggest that Ms. DeGroot knew

7   that the bank accounts were frozen?

8   A    Yes.

9   Q    What is that evidence?

10  A    She had sent an e-mail saying that the first account had

11  been frozen and that -- and --

12  Q    And did she also -- did she have access to the online

13  banking?

14  A    Yes, she did.

15  Q    Okay.  Let's look at Government Exhibit 13.  Can you tell

16  us what this document is?

17  A    It's an excerpt from the Bank of America account, showing

18  wire transfers that were initiated.

19  Q    Okay.  So this is EarthWater's Bank of America account?

20  A    Correct.

21  Q    And is this the account that held the victim funds?

22  A    Yes.

23  Q    Okay.  When were these wires initiated?

24  A    On May 6, 2019.

25  Q    And is that -- that's the date that Mr. Barnes was

1    arrested?

2    A    Correct.

3    Q    And was there also a search of EarthWater's offices on

4    that date?

5    A    Yes.

6    Q    And was Ms. DeGroot present when those offices were

7    searched?

8    A    Yes.

9    Q    Did these transactions, did these transfers take place

10   after the time that that search took place?

11   A    Correct.

12   Q    Okay.  Tell us, what amounts of money were transferred?

13   A    $20,000 and then $210,000.

14   Q    Who was the $20,000 transferred to?

15   A    To Ms. DeGroot.

16   Q    Okay.  At another financial institution?

17   A    Yes.  At Wells Fargo.

18   Q    And how about the $210,000?

19   A    That one was stopped by the bank.  It was --

20   Q    Where was that money going?

21   A    To another EarthWater account.

22   Q    Or to an EarthWater affiliate?

23   A    Yes.

24   Q    Okay.  How do you know that it was Ms. DeGroot who was

25   transferring this money?

1   A    Because of the IP address that was captured by the bank to

2   initiate the wire transfer.

3   Q    All right.  Let's look at Government Exhibit 14.  I'm

4   sorry.  Let's look at Government Exhibit 15.  What is this

5   document?

6   A    This is the subscriber record from Charter showing that

7   Beth DeGroot was issued that IP address between October 12,

8   2018 and May 30, 2019.

9   Q    And is this the same IP address that was used to go online

10   and make those transfers on May 6th from Bank of America?

11   A    Yes.

12   Q    Okay.  Let's go back to Government Exhibit 14.  Can you

13   tell us what this document is?

14   A    This is from Wells Fargo Bank showing the wire transfer

15   going to Ms. DeGroot's account there.

16   Q    And this is the wire transfer in the amount of $20,000?

17   A    Correct.

18   Q    And this transfer was actually completed, correct?

19   A    Yes.

20   Q    Okay.  Let's move on to Government Exhibit 16.  Can you

21   tell us what this document is?

22   A    This was an e-mail sent to Mr. Koster regarding an

23   EarthWater restructuring plan.

24   Q    Okay.  And was this texted by Ms. DeGroot to Mr. Koster?

25   A    Yes.

1  Q   And you said there's some sort of plan here.  Can you just

2  walk us through what the plan was?

3  A   The plan was to take existing stockholders who had

4  EarthWater stock and have them transfer it into a new stock

5  called Newco, LLC, and then also issue another $2.5 million in

6  new stock to raise money.

7  Q   Okay.  So, EarthWater -- so, a second company was going to

8  be incorporated?

9  A   Yes.

10  Q   With a different name?

11  A   Correct.

12  Q   And then the EarthWater victims were going to swap their

13  stock for -- their old EarthWater stock for new stock in this

14  new company?

15  A   Yes.

16  Q   And then that new company was going to issue $2.5 million

17  in securities?

18  A   Yes.

19  Q   To sell?

20  A   Correct.

21  Q   To new victims?

22  A   Yes.

23  Q   Let's take a look at Government Exhibit 17.  Can you tell

24  us what this document is?

25  A   This is the same restructuring plan that was sent from Ms.

1  DeGroot to Jim Jensen.

2  Q    Okay.  And, again, Mr. Jensen is a victim?

3  A    Yes.

4  Q    And how much did he lose?

5  A    $150,000.

6  Q    Now, did there come a point in time where Ms. DeGroot

7  asked Mr. Jensen for money to pay for the legal fees

8  associated with this transaction?

9  A    Yes.

10  Q    How much did she ask for?

11  A    $5,000.

12  Q    All right.  Let's look at Government Exhibit 18.  Can you

13  tell us what this document is?

14  A    This is an e-mail to Ward Capital, who was another victim

15  in the case.  And it's from Beth DeGroot.

16  Q    What e-mail address did she use?

17  A    tristargroupllc.

18  Q    And was Mr. Barnes copied?

19  A    Yes.

20  Q    What e-mail address did he use?

21  A    masterplan150.

22  Q    Was -- I think you said Ward Capital was a victim.

23  A    Correct.

24  Q    How much money did they lose?

25  A    $1.5 million.

1  Q   And this e-mail was sent around the same time that she

2  contacted Mr. Jensen about the plan to restructure EarthWater?

3  A   Correct.

4  Q   All right.  Let's look at Government Exhibit 20.  What do

5  these e-mails show?

6  A   It's --

7  Q   Or, I'm sorry.  What are these documents?

8  A   It's an e-mail from Jim Jensen to Beth DeGroot at

9  bdegroot@yahoo.com, discussing taking EarthWater for an IPO.

10 Q   Okay.  So these are continued communications between Ms.

11 DeGroot and a victim about how to sell EarthWater stock?

12 A   Correct.

13 Q   All right.  Let's look at Exhibit 20.  I'm sorry, Exhibit

14 21.  Can you tell us, what is this document?

15 A   It's text messages from Ms. DeGroot to Jim Jensen asking

16 for additional money to help pay for accounts payable for

17 EarthWater.

18 Q   And when you say accounts payable, what are some of the

19 types of things that she was looking to get money for?

20 A   Payroll.  Rent.  A car lease.  Insurance.

21 Q   Okay.  When you said payroll, how much payroll?

22 A   $60,000.

23 Q   What -- how did Mr. Jensen respond to Ms. DeGroot's

24 request?

25 A   It seemed from his response that he was upset about it and

1    that she was only contacting him to get money and nothing

2    else.

3    Q    And did Ms. DeGroot reply?

4    A    Yes.

5    Q    What did she say?

6    A    She said that she hadn't been paid in six weeks and she,

7    you know, she thought of him as a friend and that she was

8    upset that he did not want to help.

9    Q    When she said that she had not been paid in six weeks, was

10   that true?

11   A    No.

12   Q    Why not?

13   A    She had been paid shortly after the initial arrest,

14   because Resourcing Edge did release one round of payroll.

15   Q    Okay.  And did that one round of payroll include the

16   additional money, the pay raise that she had been given?

17   A    Yes.

18   Q    All right.  Let's look at Government Exhibit 22.

19   A    Okay.

20   Q    Can you tell us what this document is?

21   A    This is from the Collin County Clerk's Office showing the

22   purchase of a home in Plano, Texas and Ms. DeGroot as the

23   owner.

24   Q    Okay.  And when did she purchase this home?

25   A    In July.  July 16, 2019.

1    Q    And does it look like she's got a mortgage?

2    A    Yes.

3    Q    And what was the amount of that mortgage?

4    A    Over $250,000.

5    Q    Based on your training and experience, and investigation

6    to date, do you believe that Ms. DeGroot poses a danger of

7    economic harm to the community?

8    A    Yes.

9    Q    Why?

10   A    Because immediately after the arrest, she continued to

11   contact prior victims in order to get more money from them in

12   order to keep herself afloat because she no longer had

13   employment.  And they also -- she also helped create a plan in

14   order to victimize new people by trying to sell new stock in

15   Newco, LLC.

16   Q    And in the short time period between when Mr. Barnes was

17   arrested and today, based on your investigation to date, how

18   much money did she either take or try to raise using

19   EarthWater?  How much total?

20   A    Total?  Almost $3 million.  Or just under $3 million.

21   Q    Okay.

22              MR. FENTON:  No further questions.  Thank you.

23                        CROSS-EXAMINATION

24   BY MR. SANDEL:

25   Q    Inspector Hallstrom, good afternoon.

 1    A    Hi.

 2    Q    How long have you been working on this case?

 3    A    About six months.

 4    Q    Okay.  And you went through these exhibits one by one.  I

 5    won't belabor the point.  But I do want to ask you some

 6    questions about them, starting first with Exhibit 1.

 7    A    Uh-huh.

 8    Q    When did you come into possession of this document?

 9    A    I don't have the exact date of when it was subpoenaed.

10    Q    Was it within the last week?  Last month?  Last six

11    months?

12    A    Well, the investigation into Ms. DeGroot started after the

13    original arrest of Mr. Barnes.

14    Q    So it would have been sometime --

15    A    So, it was after May.

16    Q    -- after May 6th --

17    A    Yes.

18    Q    -- of 2019?

19    A    Yes.

20    Q    But you're not sure how recently you got it?  I see a date

21    on the top left there of 8/1/2019.

22    A    Yes.

23    Q    Does that help?

24    A    Yes.

25    Q    Okay.  So would that have been about when you get it?

1    A    Yes.

2    Q    Turning to Exhibit 2, same question.  When did you get the

3    subscriber information?

4    A    It would have been around the same time.

5    Q    Around the same time?

6    A    Uh-huh.

7    Q    Exhibit 3.  Same question.

8    A    Yes.  It would have been around the same time.

9    Q    And so we don't have to go through each one, do you know

10   if there are any exhibits in here that you either received or

11   came into possession of after that August 1st of 2019 date

12   that we saw?  Is that probably the most recent document in

13   here?

14   A    I believe the Resourcing Edge documentation --

15   Q    Okay.

16   A    -- may have been after that.

17   Q    So, Resourcing Edge?

18   A    Uh-huh.

19   Q    That would have been Exhibit --

20   A    Like Exhibit 12.

21   Q    -- 12, I believe?

22   A    Yeah.  There was the one with the payroll.  Exhibit 19.

23   Q    Okay.  When did you get Exhibit 12?  I see -- see, I see

24   on Exhibit 12 June 17th of 2019 there at the bottom left.

25   A    Uh-huh.  Yes.  We had interviewed them -- I'm trying to

1    think of when that interview was.  I'm not sure.

2    Q    Okay.

3    A    I'm sorry.

4    Q    That's fine.  But if --

5    A    Uh-huh.

6    Q    If that says --

7    A    It's -- maybe this one document may not have been, but we

8    did get additional documentation from Resourcing Edge.  The

9    audit trail.

10   Q    Okay.  And when --

11   A    That could have been the ones that we received during that

12   --

13   Q    When did that come in?

14   A    I believe it would have been after August 1st.

15   Q    Okay.  Soon after August 1st, but sometime in August,

16   probably?

17   A    Sometime in August, I believe.

18   Q    You said that Buddy was arrested May 6th of 2019, correct?

19   A    Yes.

20   Q    You said that that date or on that date, you did -- a

21   search warrant was executed at his office?

22   A    Correct.

23   Q    Do you know if computers were seized?

24   A    Yes.

25   Q    Were phones seized?

1  A    I don't believe so, at that time.

2  Q    Okay.  But certainly it was a search warrant that was

3  executed in a very visible manner that everybody knew that's

4  what you were doing, right?

5  A    Yes.

6  Q    Turning to Exhibit 6, I believe this is the text message

7  string.  And who did you say that these text messages are

8  between?  It was Beth and --?

9  A    This one was Mr. Barnes and Jonathan Koster.

10 Q    Okay.  And so this is -- this is Mr. Barnes and Jonathan

11 Koster?

12 A    Yes.

13 Q    And on that first -- or, it's Page -- it's the first page

14 of the exhibit, that second message down, if I'm reading that

15 correctly:  "If you could front me a credit card for the

16 retainer tomorrow."  Is that how that reads?

17 A    Yes.

18 Q    So is it fair to say that it looks like Buddy is asking a

19 friend to help pay for his legal fees?  Is that a fair

20 representation of what that question is?

21 A    That's fair.

22 Q    Now, you also spent some time reviewing Exhibit 13, so

23 let's turn there.  Exhibit 13, you said that shows a wire

24 transfer, right?

25 A    Yes.

1  Q    Now, in looking at these two line items, if I'm reading

2  this correctly, where can you see the time that Ms. DeGroot

3  signed on and initiated the transfer?

4  A    On the first page, --

5  Q    Uh-huh.

6  A    -- the Session Sign-On TM.

7  Q    Session Sign-On TM?

8  A    Yes.

9  Q    Okay.  So what is that, the one right before that, Session

10 Sign-On DT?

11 A    I'm not sure.

12 Q    Okay.  Because I see a date and a time stamp there --

13 A    Uh-huh.

14 Q    -- of the 6th of May right at midnight, so literally the

15 very first thing on May 6th.  That would have been before

16 Buddy got arrested, correct?

17 A    Yes.

18 Q    Okay.

19 A    It could have been the initial logon from -- like if they

20 were logged onto the Internet banking or online banking, that

21 session could have been open from that day.

22 Q    It could have been?

23 A    Could have been.  But --

24 Q    But we don't -- we don't know?

25 A    Correct.

1  Q    So, fair to say we're not sure when these wire transfers

2  actually got initiated?  Just some time on the 6th?

3  A    They do have a session end time.

4  Q    All right.  What time is that?

5  A    On the second page.  1154 and 1203.

6  Q    Are those a.m. or p.m.?

7  A    Those are a.m. into p.m.  The 1203 would have been p.m.

8  Q    And how do we know that?

9  A    Most -- most banks, and I'm just speaking from my

10 experience, use military time.

11 Q    Okay.  So you're saying that if it were p.m., it would be

12 --

13 A    So, if it were 1:00 o'clock in the afternoon, it would

14 have said 1300 hours.

15 Q    Okay.  So then on that second line, the end time, would it

16 be 1203, so it'd be three minutes after noon?  Is that what

17 you're saying?

18 A    Yes.

19 Q    Okay.  And, again, this is just kind of -- we're guessing

20 because that's kind of how most banks do it?

21 A    Correct.

22 Q    Okay.  Fair enough.  Next, if you will turn, please, to

23 Exhibit 21.  And you said this was a text message chain

24 between whom?

25 A    Ms. DeGroot and Jim Jensen.

1    Q    Jim Jenson?

2    A    Yes.

3    Q    Is this the beginning of that text message chain, or are

4    there messages that happened before this?

5    A    I'm not sure.

6    Q    Because the first message reads, "The way you can help is

7    by sending funds"?

8    A    Yes.

9    Q    So is it a fair assumption that Mr. Jensen would have

10   asked, "Hey, how can I help?"

11   A    Yes.

12   Q    But we don't see that here?

13   A    Correct.

14   Q    So we're not sure of the context of all this, other than

15   what we see here, right?

16   A    Yes.

17   Q    Okay.  Inspector Hallstrom, how long have you been a

18   postal inspector?

19   A    Five years.

20   Q    Okay.  And would you say it's fairly common, once a person

21   subject to an investigation has an e-mail account seized, that

22   they cease using that e-mail account?

23   A    The e-mail accounts for EarthWater were not seized.

24   Q    Or once they know that they're under investigation, would

25   it be uncommon for somebody to just cease using those accounts

1    and those phone numbers?

2    A    No, it wouldn't be uncommon.

3    Q    Would it shock you if I were to tell you that I've advised

4    clients in the past to stop using those e-mail accounts if I

5    know they're under investigation?

6    A    I wouldn't be shocked by that, no.

7    Q    Would there be anything wrong with that?

8    A    No.

9    Q    In fact, can you see why that might be a smart move,

10   seeing as how it alleviates any impression that they're going

11   and deleting e-mails or purging an inbox or something like

12   that, if I simply say, just don't log on anymore?

13   A    In that scenario, yes.

14   Q    And when those individuals are answering questions, hey,

15   why can't I use your old e-mail address, --

16   A    Uh-huh.

17   Q    -- would it be wise for them to simply say, they're

18   compromised, use this new one?

19   A    That's -- yeah.

20   Q    That's a reasonable action, correct?

21   A    Yes.

22   Q    The same goes for phone numbers.  Would it be reasonable

23   to get a new phone number and simply, without disclosing

24   private information, just say, hey, just use the new number?

25   Would that be reasonable?

1  A    Yes, if it was in your name.

2  Q    Sure.  And so if somebody can't get a cell phone, would it

3  be reasonable for them to ask somebody, hey, can you get a

4  cell phone for me?

5  A    Yes.

6          MR. SANDEL:  No further questions, Your Honor.

7          THE COURT:  Any redirect?

8          MR. FENTON:  Just briefly, Your Honor.

9                     REDIRECT EXAMINATION

10  BY MR. FENTON:

11  Q    Can you turn to Government Exhibit 13?  If you look at the

12  -- the session end time for the $20,000 transfer, what is that

13  time?

14  A    12:03 p.m.

15  Q    12:03 and how many seconds?

16  A    50.

17  Q    Okay.  And is this -- what time zone is this in?

18  A    Pacific time.

19  Q    Okay.  How do you know that?

20  A    From the bank records.

21  Q    All right.  And let's go to Government Exhibit 14.  Can

22  you go down to the middle of the page where it says,

23  Acceptance Time -- Acceptance Time Stamp?

24  A    Yes.

25  Q    Can you say, can you tell us, what is the receipt time

1    there?

2    A    1504.

3    Q    Okay.  What would that be in military time?

4    A    That would be 3:04 p.m.

5    Q    p.m.?  In the afternoon?  Does that time match the time in

6    Exhibit 13, approximately?

7    A    Yes.

8    Q    Okay.

9            MR. FENTON:  No further questions.

10           THE COURT:  Any recross, limited to the redirect?

11           MR. SANDEL:  Yes, very briefly, Your Honor.

12                        RECROSS-EXAMINATION

13   BY MR. SANDEL:

14   Q    Looking at that Exhibit 14, I think I found where you were

15   looking.  You said that Acceptance time stamp is what you're

16   referring to that says 1504; is that correct?

17   A    Yes.

18   Q    Okay.  Who or what entity would mark that time?

19   A    Wells Fargo.

20   Q    And so that's the time that after they've reviewed the

21   wire, have accepted it, and it has cleared?  That's the time

22   that that time stamp gets put on there?  Or how does that

23   work?

24   A    I would believe so, yes.

25   Q    Okay.  So all we know, based on looking at 1504, is that

1    at some point before 1504 the wire was initiated, right?

2    A    Yes.

3    Q    But there's no indication of how far before 1504, correct?

4    A    Yeah.  Wire transfers are usually pretty instantaneous.

5    That's the --

6    Q    Usually.

7    A    -- appeal to them.

8    Q    Sure.  Usually.

9    A    Uh-huh.

10   Q    Okay.

11          MR. SANDEL:  No further questions, Your Honor.

12          THE COURT:  You may step down.

13          THE WITNESS:  Thank you.

14      (The witness steps down.)

15          THE COURT:  Call your next witness, please.

16          MR. FENTON:  We have no further witnesses, just

17   argument, Your Honor.

18          MR. SANDEL:  We will not be calling any witnesses,

19   Your Honor.  Simply argument.

20          THE COURT:  Then you may proceed.

21          MR. FENTON:  Thank you, Your Honor.

22      There are three primary reasons behind the Government's

23   motion to detain.  The first is the serious risk that Ms.

24   DeGroot will manufacture or alter evidence, both in her case

25   and also in Mr. Barnes' case, which is scheduled to go to

1    trial in March 2020.

2         The second primary concern is the serious risk that Ms.

3    DeGroot will continue to target the elderly people who Mr.

4    Barnes has already victimized in an attempt to get more money.

5         The third serious risk is that DeGroot will try to hide

6    Barnes' assets to avoid forfeiture and also to avoid using

7    funds for victim restitution.

8         Now, the evidence of these risks in this case is

9    overwhelming.  There's clear evidence showing that DeGroot

10   altered evidence that she produced to the grand jury.  Simple

11   comparison of the evidence that she produced against the

12   evidence that other people produced show exactly how she did

13   it, and you can see how she misled the grand jury, to hide the

14   fact that she was using these other e-mail accounts that she

15   had only recently created after Mr. Barnes was arrested.

16        There is also substantial evidence showing that

17   immediately after Mr. Barnes was arrested DeGroot engaged in a

18   concerted effort to raise or take nearly $3 million in funds.

19   Now, $2.5 million was an intent to raise stock.  But there's

20   also approximately $400,000 there that Ms. DeGroot is taking

21   through other means.

22        The various means that she used to try to get money in

23   this cash grab after Mr. Barnes was arrested was to, first of

24   all, try to clean out EarthWater's bank accounts.

25        Second, she lied to the payroll processor to try to get

1    them to continue to process payroll checks.  And when you look

2    at the amounts that she was seeking at that time, she was

3    seeking amounts that were far in excess of what she had

4    received previously through the normal payroll channel.  She

5    gave herself a raise, and she also sought a lump sum, an

6    additional amount -- payment of about $30,000.  That's all in

7    Exhibit 12.

8         The third thing that she did was that she tried to

9    reincorporate EarthWater under an assumed name and then

10   continue to sell stock.

11        And fourth, she directly approached a 78-year-old victim

12   and asked him for $108,000.  This is a man who had already

13   lost $150,000.  She approached him.  She asked him for

14   $108,000 more.  And when he said no, she lied to him and told

15   him, in an effort to con him, that she hadn't been paid, when,

16   in fact, she actually had been paid only two weeks prior and

17   the paycheck that she had received was greater than any

18   paycheck that she had ever received from EarthWater before.

19        All of these events, all of them, took place after Mr.

20   Barnes was arrested and the indictment was unsealed.  None of

21   this was in any way aboveboard.  She knew it was wrong.  And

22   we know that because she tried to hide it, both from law

23   enforcement, in the first instance, and in the second

24   instance, from the grand jury when she was subpoenaed.

25        The incentives for Ms. DeGroot to engage in these

1    activities are only going to become greater as, one, Mr.

2    Barnes approaches trial, which is going to happen in March

3    2020, if it doesn't get continued.  And second, when she runs

4    out of money.  Ms. DeGroot is not employed at the moment, and

5    she no longer has the source of income that she has been

6    relying on.

7         The only question at this point is, are there any

8    conditions that would be sufficient to prevent her from -- to

9    mitigate these risks and to prevent these things from

10   happening?  And the Government believes that the answer is

11   absolutely not.  She's already demonstrated that she will not

12   comply with any conditions of release.  She helped Mr. Barnes

13   violate his conditions of release, and she attempted to help

14   -- she helped him attempt to hide it from law enforcement.

15   There's no reason to believe that this time is going to be any

16   different, and all the evidence that we've submitted suggests

17   that it would not.

18        In addition, I think it's important to note that the

19   length of time here between when Ms. DeGroot might be detained

20   and the trial would not necessarily be that long.  The

21   Government is ready to try this case in short order.  It's a

22   simple case.  It's a straightforward case.  There's only two

23   counts.  We're submitting the proposed discovery -- proposed

24   protective order today.  We're ready to make our first

25   production of discovery.

1        So, assuming that we can find time on the Court's

2    calendar, we can try the case in relatively short order.

3        Thank you, Your Honor.

4            THE COURT:  Thank you.  Mr. Sandel?

5            MR. SANDEL:  Thank you, Your Honor.  Your Honor, as

6    the Court is very well aware, the job here today is not to

7    determine whether or not Ms. DeGroot is guilty of the

8    obstruction that she's alleged to have participated in, but is

9    to simply weigh whether or not she is a flight risk or a

10   danger to the community.

11       The Government is not alleging that she's a flight risk,

12   and I think rightfully so.  She's lived in the area for 44

13   years.  She's got three children in the area, grandchildren in

14   the area.  Many ties to the community.  She has absolutely no

15   criminal history.  And so the Court's decision circles around

16   whether or not the Government has proved, has carried their

17   burden to prove that she's a danger to the community.  I don't

18   think they have.

19       The evidence that we've gone over here today, all of which

20   predates this hearing by months, can certainly and I expect

21   will be used at trial to bolster some of the allegations being

22   made against her.  But it's very important for me to remember

23   that, after Buddy was arrested back in May of this year, he

24   certainly was on conditions of this Court, but she wasn't.

25   And so there were things that she was perfectly allowed to do

1   that Buddy maybe could not.  And to expect her to abide by the

2   same conditions that Buddy had when he was released is just

3   simply not how this process typically works.

4       There's nothing wrong with her opening a new e-mail

5   account.  There's nothing wrong with her obtaining a cell

6   phone.  And as for the raising money, you know, I think that

7   deserves diving into at trial if they believe that was an

8   indictable offense.  But in all of the exhibits that were

9   shown here before the Court, they were simply -- she was

10  literally just an intermediary between two people trying to

11  transact a business deal.

12      The flow charts and the graphs put up, the restructuring

13  of EarthWater, I don't think there's any evidence that can

14  even show that she had anything to do with how that would be

15  set up or how that would look, because it was simply not her

16  area of expertise.  She was simply passing messages along.

17      Now, I did hear the Government talk about that they're

18  willing to try this case in short order.  And while I

19  appreciate that, my conversations with counsel that are

20  representing clients in the related case indicates to me

21  there's something like ten million documents in discovery.

22  And so I don't know if I want to commit to saying, well,

23  certainly, let's get a fast-track trial on this, when I have

24  no idea just how extensive the discovery needs to go to show

25  the allegations against Ms. DeGroot.

1     And the reason that becomes important is a very cursory

2 calculation of what her sentencing guidelines would be, even

3 assuming she pleads not guilty and proceeds to trial, is

4 something like 15 to 21 months.  If she were to take a plea

5 deal and get full acceptance of responsibility, you're looking

6 at 10 to 16 months.

7     The trial in Buddy's case is currently scheduled for March

8 of 2020.  That's its first setting, and it's just been

9 declared as complex.  So I think it highly unlikely that case

10 actually proceeds to trial in March.  So I think it very

11 possible, if not likely, that if Ms. DeGroot is detained

12 today, her pre-trial detention would outstretch any sentence

13 that she would likely be imposed.

14     So it's for those reasons, Your Honor, I would simply

15 argue that the Government has failed to meet its burden

16 showing that Ms. DeGroot is a danger to this community, and I

17 would respectfully request that the Court craft reasonable

18 conditions so that she can be released and she would abide by

19 those.

20     Thank you, Your Honor.

21         THE COURT:  I disagree with you about the danger that

22 she -- her being a danger to the community.  However, I do

23 believe that there are a combination of conditions I can

24 impose in this case which would reasonably assure that she's

25 not.

1      And so I am going to deny the Government's motion for

2  detention and enter an order setting conditions of release.

3  And those orders will include, Ms. DeGroot, that you not

4  violate any state, local, or federal law while on release.

5  That you must appear in court as required.  And if in this

6  case you are ultimately sentenced to a term of imprisonment,

7  that you must surrender to serve that term as directed.

8      That you report for supervision to and by the Pretrial

9  Services Office.  There's a Pretrial Services officer in the

10  courtroom who will give you information about reporting today.

11      That you actively seek employment.  And I do not mean at

12  EarthWater or any iteration of EarthWater.

13      That you must surrender your passport to the Clerk of the

14  Court by 10:00 a.m. on Tuesday, October 15th.  You're not to

15  obtain any other passport or any other type of international

16  travel document.

17      Your travel will be restricted to the Northern and Eastern

18  Districts of Texas unless the Pretrial Services officer says

19  you can travel elsewhere.

20      That you are to avoid all contact, directly or indirectly,

21  with any person who may be a victim or witness in the

22  investigation or prosecution of this case.  That includes and

23  I'm going to specifically say anyone who was ever involved in

24  whatever capacity in EarthWater or its iterations.  It's also

25  going to include Mr. Barnes.

1          MR. SANDEL:  Briefly, Your Honor, I know at some

2     point very briefly her daughter did work at EarthWater.

3          THE COURT:  Your daughter is an exception.

4          MR. SANDEL:  Thank you, Your Honor.

5          THE COURT:  And obviously, that would include people

6     like Mr. Jensen and anyone else who's ever invested.

7          You are not to use alcohol excessively.  You're not to use

8     or possess any controlled substance that's not been prescribed

9     to you by your health care practitioner.  And you're to submit

10    to testing for use of the same if requested by your Pretrial

11    Services officer.

12         You're to report to Pretrial Services every contact you

13    have with law enforcement personnel, including any arrests,

14    questioning, or even a traffic stop, whether or not you get a

15    citation.

16         You're not to have -- nothing whatever to do with

17    EarthWater.  No involvement in any businesses that offer or

18    sell any kind of securities.

19         Also, I'm making it a requirement that you participate in

20    the computer monitoring program in the Probation Office, and

21    that will include that you shall not have access to any

22    computer.  You shall participate and comply with the

23    requirements of the computer Internet monitoring program,

24    contributing to the cost of that program in an amount not to

25    exceed $40 a month.

1        And as part of that program, you'll consent to the

2   probation officers conducting ongoing monitoring of your

3   computers.  Monitoring may include installing hardware or

4   software systems that allow for the evaluation of your

5   computer use.  You shall submit to periodic unannounced

6   examination of your computer storage media and any other

7   electronic or Internet-capable devices by the probation

8   officer at a reasonable time, in a reasonable manner, based on

9   any reasonable suspicion of any contraband or misuse or

10  violation of supervision.

11       You're not allowed to use a computer other than one that

12  you've been authorized to use by the probation officer.

13       There's more restrictions on the kind of software you can

14  use if allowed by the probation officer.

15       You're not to use or possess any device that allows

16  Internet access other than that authorized by the U.S.

17  probation officer, and that would include personal, what do

18  they call them, the PDAs, gaming devices, cellular telephones.

19  And there are some other conditions, but I'm going to include

20  them in what I'm handing down to you to go over with your

21  attorney.

22       Before I do that, of course, the Government was seeking

23  detention, which I denied that.  In light of that fact and

24  what I've announced here today, is the Government seeking any

25  additional conditions?

1          MR. FENTON:  Yes, Your Honor.  Two additional

2     conditions.  The first, we would ask that Ms. DeGroot be

3     prohibited from opening any new lines of credit or any new

4     bank accounts.

5          THE COURT:  That will be granted.

6          MR. FENTON:  The second condition is a prohibition

7     from her getting custody or control of any funds or property

8     belonging to anyone other than herself.

9          THE COURT:  I don't understand that one.

10          MR. FENTON:  So, we want to prevent the situation

11     where she can operate as an intermediary to facilitate the

12     transfer funds between someone -- between two individuals who

13     are not herself.  Like taking custody, for example, of Mr.

14     Barnes' funds.  So, --

15          THE COURT:  Well, I'll prohibit her from having Mr.

16     Barnes' funds, handling his funds.

17          MR. FENTON:  Okay, Your Honor.

18          THE COURT:  You know, if she can't work, somebody

19     might transfer her some funds.

20          MR. FENTON:  Right.  The intent is to prevent the

21     transfer of funds from Mr. Barnes to her.  So as long as the

22     condition prohibits that, or her taking custody or control of

23     those types of funds or property, --

24          THE COURT:  Uh-huh.

25          MR. FENTON:  -- the Government would be satisfied.

1          THE COURT:  What was the wording of that first one
2  you asked again?
3          MR. FENTON:  The first condition?
4          THE COURT:  The one you just asked first before you
5  were talking about the funds.
6          MR. FENTON:  No new lines of credit.
7          THE COURT:  Okay.
8          MR. FENTON:  Yeah.  So, no -- Ms. DeGroot would be
9  prohibited from opening any new lines of credit or any new
10  bank accounts.
11     (Pause.)
12          THE COURT:  So this will be property that will be in
13  the name of Mr. Barnes?  Or how do we -- I need to be able to
14  enforce any condition that I make.
15          MR. FENTON:  I think we can say, yes, she should be
16  prohibited from taking custody or exercising control over any
17  funds or property in the name of Mr. Barnes.
18     (Pause.)
19          THE COURT:  Okay.  So, I've added conditions -- I've
20  added language to that effect.
21      And so I'm going to hand down this order setting
22  conditions of release, Ms. DeGroot, for you to go over with
23  Mr. Sandel.  And at the point that you believe that you
24  understand the conditions under which I am releasing you and
25  agree to abide by them, there is a place on the third and last

1   page for you to sign indicating that.  And if you could let me

2   know when you're done.

3           MR. SANDEL:  Thank you, Your Honor.

4       (Pause, 3:00 p.m. to 3:04 p.m.)

5           THE COURT:  Thank you.  Ms. DeGroot, I've now been

6   handed back the order setting conditions or release in your

7   case, and it looks like you've now signed on the fifth and

8   last pages.  Is this your signature?

9           THE DEFENDANT:  Yes, it is.

10          THE COURT:  Before you signed the order setting

11  conditions of release, did you have enough time to go over

12  them with your attorney?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  Do you understand the conditions under

15  which I am releasing you?

16          THE DEFENDANT:  Yes, ma'am.

17          THE COURT:  Do you agree to abide by the conditions?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  Although it's contained in the order

20  itself, of which you will receive a copy, I am required to

21  advise you here in court that failing to appear in court as

22  required is a crime for which you may be prosecuted, in

23  addition to and different than those offenses you've already

24  been charged with.

25      If you violate any condition of release, a warrant for

1   your arrest may be issued and you may be jailed pending your

2   trial and also prosecuted for contempt of court.

3        Committing a crime while on release may lead to more

4   severe punishment than you might receive for committing the

5   very same crime when you were not on release.

6        It is a crime to try to influence, threaten, attempt to

7   bribe, or retaliate against any juror, witness, or other

8   person who may have information about this case, or to

9   otherwise obstruct the administration of justice.

10        Do you understand the conditions or the consequence of

11   failing to abide by or violating any condition of release?

12             THE DEFENDANT:  Yes, ma'am.

13             THE COURT:  And I will say that you were present at

14   the time that I had a hearing on allegations that Mr. Barnes

15   violated his conditions of pretrial release, very much the

16   same allegations that were presented against you here.  So you

17   know that I will not hesitate to order that you be jailed if I

18   determine at a future date that you have violated any

19   condition of release that I am imposing in this case.

20             THE DEFENDANT:  Yes.

21             THE COURT:  Do we understand each other?

22             THE DEFENDANT:  Yes, ma'am.

23             THE COURT:  So I am signing this order setting

24   conditions of release in your case and ordering that you be

25   released after processing by the United States Marshals

1    Service.

2         Is there anything else we need to do in Ms. DeGroot's case

3    today?

4              MR. FENTON:  No, Your Honor.

5              MR. SANDEL:  Nothing for the Defense, Your Honor.

6              THE COURT:  Ms. DeGroot, that concludes your hearing.

7    Good luck to you.  The attorneys are excused.

8              MR. SANDEL:  Thank you, Your Honor.

9         (Proceedings concluded at 3:06 p.m.)

10                            --oOo--

11

12

13

14

15

16

17

18

19

20                         CERTIFICATE

21         I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                          **10/21/2020**

24   _____    _____

25   Kathy Rehling, CETD-444                      Date
     Certified Electronic Court Transcriber

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                              INDEX

PROCEEDINGS                                                    3

WITNESSES

Government's Witnesses     Direct   Cross   Redirect   Recross

  Anna Hallstrom             4       27       36         37

EXHIBITS

Government's Exhibits                      Identified Received

1      AT&T Subscriber Information, 3161        6          7
2      Google Subscriber Information,           7          8
       masterplan150@gmail.com
3      Subscriber Details for Oath/Yahoo,       8          8
       tristargroupllc@yahoo.com

All Government's Exhibits Received                           10

RULINGS                                                      44

END OF PROCEEDINGS                                           52

INDEX                                                        53