<u>IN THE UNITED STATES DISTRICT COURT</u>

<u>FOR THE NORTHERN DISTRICT OF TEXAS</u>

<u>DALLAS DIVISION</u>


UNITED STATES OF AMERICA     (   3:19-CR-00521-K-1
           Government,      (
                               (
                               (
VERSUS                           (   DALLAS, TEXAS
                               (
                               (
                               (
BETH ELLEN DEGROOT            (
           Defendant.       (   NOVEMBER 16, 2022


TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE ED KINKEADE

UNITED STATES DISTRICT JUDGE


<u>A P P E A R A N C E S</u>:


   FOR THE GOVERNMENT:    MARY F. WALTERS-DOJ
                             US Attorney's Office
                             1100 Commerce St
                             Third Floor
                             Dallas, TX 75242
                             214-659-8685
                             Fax: 214-659-8812

                             THEODORE M. KNELLER-DOJ
                             DOJ-Crm U.S. Department of Justice
                             Criminal Division, Fraud Section
                             1400 New York Avenue NW
                             Washington, DC 20005
                             202-514-5799
                             Email: theodore.kneller@usdoj.gov

```
FOR THE DEFENDANT:    JAMES P. WHALEN
                      Whalen Law Office
                      9300 John Hickman Parkway
                      Suite 501
                      Frisco, TX 75035
                      214-368-2560
                      Fax: 972-829-8654
                      Email: jwhalen@whalenlawoffice.com
```

```
COURT REPORTER:    PAMELA J. WILSON, RMR, CRR
                   pam_wilson@txnd.uscourts.gov
                   1100 Commerce Street, Room 1535
                   Dallas, Texas 75242
                   214.662.1557
```

    Proceedings reported by mechanical stenography,

transcript produced by computer.

1     SENTENCING - NOVEMBER 16, 2022

2               P R O C E E D I N G S

3          THE COURT:  This is the case of United States of

4     America versus Beth Ellen Degroot.  I hope I pronounce that

5     right, cause number 3:19-CR-521-K.

6          And, Mr. Ted Kneller and Ms. Walters are here for the

7     government and y'all are ready?

8          MR. KNELLER:  Yes, Your Honor.

9          THE COURT:  And Mr. James Whalen is here today for

10    the defendant.

11         MR. WHALEN:  Yes, Your Honor.

12         THE COURT:  Good to see you.

13         MR. WHALEN:  Good to see you.

14         THE COURT:  Ms. Degroot, on May 17, 2022, you plead

15    guilty before United States Magistrate Judge Renee Toliver to

16    count 1 of a four count superseding indictment to conspiracy

17    to commit wire fraud.  All of that was pursuant to an

18    11(c)(1)(B) agreement regarding the guideline calculations.

19    I accepted your guilty plea on June 1st, 2022.  And as part

20    of the agreement, I'm going to dismiss the original

21    indictment and the remaining counts of the superseding

22    indictment 2 to 4 today at sentencing.

23         And what we have is an offense level 14, criminal

24    history category 1, with a guideline range of 15 to 21

25    months.

1         There of a number of objections.

2         Why don't you go over that and clarify what's been

3    accepted and what hasn't, what I still need to -- what I

4    still need to deal with.  Okay?

5              MR. WHALEN:  Yes, Your Honor.

6         Really there's just two objections you have to deal

7    with.  One is related to sophisticated means enhancement.  We

8    don't believe the facts presented support the enhancement.

9    And I also think sophisticated means has become an

10   enhancement that applies in every case, kind of like the

11   computer enhancement in child pornography cases.  I don't

12   think there's anything about the facts in this case that

13   render it was sophisticated in any way, so we don't think

14   it's a proper application of that enhancement and shouldn't

15   apply.

16        And then second relates to the fine amount.  We did

17   provide some clarification about expenses and income with

18   Ms. Degroot and her husband, so we will leave that to the

19   court whether or not you think a fine is appropriate, but

20   since there is restitution going to be owed in this case we

21   think restitution would be -- will be ordered but the fine

22   based on --

23             THE COURT:  Is it an agreed amount of restitution?

24             MR. WHALEN:  It is, Your Honor.

25             THE COURT:  What is that number?

```
 1              MR. WHALEN:  It's approximately 15,000, but I can
 2   get you the exact amount.
 3              MR. KNELLER:  15,459.38.
 4              THE COURT:  You agree to that?
 5              THE DEFENDANT:  Yes.
 6              THE COURT:  And you agree?
 7              MR. WHALEN:  We do, Your Honor.
 8              THE COURT:  And it's payable to -- let me look
 9   here.         MR. WHALEN:  Resourcing Edge, Your Honor, is
10   the name of the company.
11              THE COURT:  That's who they took the money from?
12              MR. WHALEN:  Yes, Your Honor.
13              THE COURT:  There it is.  Resourcing Edge.  Okay.
14   All right.  Somewhere in Rockwall.  Okay.
15         And I have a number of letters of support for -- for
16   Ms. Degroot, from her son, her daughter, son-in-law.  This is
17   her father, I believe, George Degroot, that's your dad?
18              THE DEFENDANT:  Yes, sir.  Yes, sir.
19              THE COURT:  And -- and then a friend, Lauren
20   Brummett.
21         A sister-in-law, Nakita Blair.
22         Her husband, I'm assuming the man in the red back there.
23   Yes, Mr. May.
24         And, let's see, a niece Rochelle Kelly.
25         Her sister -- this one is a little complicated, my
```

1   sister's mom, so it's a --

2            THE DEFENDANT:  My daughter's half-sister.  She's

3   like a daughter to me.

4            THE COURT:  Okay.  She's no relation to you?

5            THE DEFENDANT:  No.  She would be my step-daughter

6   but we were divorced before she was born.

7            THE COURT:  Yeah.  Okay.  I get that.  Thank you.

8        And then -- and then Jean Hicks who is a grandmother on

9   the other side of your grandchild?

10           THE DEFENDANT:  Yes.  That's correct.

11           THE COURT:  And then the lady at this school, the

12  business manager, one of your friends.  And I assume your

13  children or grandchildren go to that school?

14       Grandchildren?

15           THE DEFENDANT:  Yes.  And she's also a client of

16  mine.

17           THE COURT:  All right.  Okay.  So I have all those

18  letters.  That's what I've got.

19       Okay.  All right.  Government, respond to those

20  objections.

21           MR. KNELLER:  Your Honor, the government supports

22  the probation office's application of a sophisticated means

23  enhancement in this case.  The facts support that following

24  the indictment in the EarthWater case the defendant obtained

25  a phone for her codefendant, created new email addresses to

1  evade law enforcement, created shell corporations, or used

2  shell corporations that were already in existence, and

3  attempted to establish bank accounts to solicit proceeds from

4  new victims.  And for those reasons we think that based on

5  the facts that the enhancement is justified.

6      With respect to the second objection of the defendant

7  regarding a fine, the government has no position with respect

8  to a fine in this case --

9          THE COURT:  Okay.

10          MR. KNELLER:   -- and defers to the court.

11          THE COURT:  Go right ahead to anything you have in

12  mitigation.  I've got all these letters.

13          MR. WHALEN:  Yes, Your Honor.  Kind of give you a

14  background.  The court is aware that the EarthWater case gets

15  indicted, she's not part of that but she answers the

16  subpoena.  She's doesn't have counsel.  Then she gets

17  counsel.  In the course of that eventually she gets arrested.

18  They come out and arrest her and take her to jail and they

19  seek detention.  They sought detention in the case and so she

20  sat in jail for three days and we had a contested detention

21  hearing and she was released.

22      And so she got released in October of 2019 and so she's

23  been on pretrial release for three years.  And during that

24  time she went out, got an esthetician license and built a

25  business.  She was able to do it despite the limitations she

1  has.  Part of what the conditions was is that her computer
2  had to be monitored the entire time and so that prevented her
3  ability -- or hampered it to be able to do the things online
4  that she needed to do in order to comply with those
5  conditions.  The entire time, the three years she's been on
6  pretrial release, she's abided by any and all of her
7  conditions.  She has no criminal history.  One could say this
8  is aberrant behavior based on her entire life of that.
9      So when you read -- take the letters of support, look at
10  her performance on pretrial release, the lack of criminal
11  history, under 3553(a), we believe that a sentence of
12  probation would be appropriate in this case, because I
13  believe with the lack -- you know, the guideline range that
14  you have and based on her performance that -- and her role in
15  this offense, we think that probation is appropriate and we'd
16  ask you to consider that.
17          THE COURT:  Ronnie, Kleenex.
18      Oh, it's there.
19      Okay.  Ms. Degroot you don't have to say anything if you
20  don't want to, but you can if you want to.
21      I'm assuming these people are with you?
22          THE DEFENDANT:  Yes.
23          THE COURT:  Your husband.
24      Who is the young fellow with the beard?
25          THE DEFENDANT:  My son.

```
 1              THE COURT:  That's your son.
 2         Who is the African-American gentleman?
 3              THE DEFENDANT:  My brother-in-law.
 4              THE COURT:  And the blond haired lady?
 5              THE DEFENDANT:  My sister-in-law and my brother.
 6              THE COURT:  And your brother.
 7         And y'all all live in Rockwall?
 8              THE DEFENDANT:  No, sir.  I live in Plano.
 9              THE COURT:  Plano.
10              THE DEFENDANT:  My son lives in Dallas.
11              THE COURT:  Okay.
12              THE DEFENDANT:  My brother --
13              THE COURT:  Okay.  That's fine.
14              THE DEFENDANT:  Close.
15              THE COURT:  All right.  Do you want to say
16    anything?
17         It's up to you.  You don't have to.
18              THE DEFENDANT:  Yes.
19              THE COURT:  It's okay to cry.  You should.  This is
20    your day.
21              THE DEFENDANT:  I just want to apologize for my
22    actions.  And I'm very embarrassed to be in this position.
23         I just think about my grandchildren and how this could
24    affect them and just -- I just wish I had made better
25    choices.
```

```
1              THE COURT:  What the heck were you thinking?

2              THE DEFENDANT:  I was trusting and I should not

3  have been.  I've learned to not be so blind trusting and to

4  check things out.

5              THE COURT:  And what?

6              THE DEFENDANT:  To check things out for myself.

7              THE COURT:  So are you telling me you just --

8  you're all sweet and nice and somebody else got you into this

9  and you didn't know this was wrong?

10             THE DEFENDANT:  I -- I would never -- I'm never,

11 ever --

12             THE COURT:  Before I ask that --

13             THE DEFENDANT:   -- that I feel is wrong.

14             THE COURT:  I didn't ask that.

15      You're guilty or not guilty?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Are you guilty?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  And you knew you were doing bad stuff.

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  I mean, you just need to get to that

22 point of admitting I did some things I shouldn't have done.

23             THE DEFENDANT:  I did.

24             THE COURT:  You're a terrible example for your

25 husband and son.  It isn't that you haven't done a lot of
```

1  good things.  You have.  I understand that.

2      You understand federal court is a terrible place to

3  be --

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  -- and you understand I'm going to

6  decide your fate in a minute?

7          THE DEFENDANT:  Yes, sir.  I've never been in

8  trouble before.

9          THE COURT:  Why shouldn't I send you to the

10 penitentiary?

11         THE DEFENDANT:  I don't know.

12         THE COURT:  What am I'm going to do to make sure

13 you don't swindle some more people?

14         THE DEFENDANT:  I'll never be in that position

15 never again.  I mean, I'm never going to do anything that I

16 feel is wrong, that I know in my heart is wrong.

17         THE COURT:  Who showed up, FBI agents or what kind

18 of agents showed up?

19         THE DEFENDANT:  Marshals.

20         THE COURT:  That's how you got arrested, marshals

21 picked you up?

22         THE DEFENDANT:  Yes.  I mean, they were supposed to

23 notify my attorneys, but they didn't.

24         THE COURT:  Okay.  Well, I mean, okay.  That

25 certainly wasn't a perfect situation, but, you know, when you

1  get into the criminal world, which you got into, there's a

2  lot of -- lot of bad turns and bad doors and bad things, you

3  know.

4      Where were you in jail?  At Seagoville?  I mean at Fort

5  Worth?

6            THE DEFENDANT:  Mansfield.

7            THE COURT:  Mansfield.  Now, that's a -- that's

8  a -- the gates of hell or somewhere in that place, right?

9            THE DEFENDANT:  Yes.  It's very scary.

10           THE COURT:  You have to wear some kind of orange

11  jumpsuit?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  And be -- you were handcuffed and in

14  chains?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  Was that -- was that some punishment?

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  Was your husband shocked to find out

19  you were up to all this?

20           THE DEFENDANT:  Very.

21           THE COURT:  What does he do?

22           THE DEFENDANT:  I'm sorry?

23           THE COURT:  What does he do for a living?

24           THE DEFENDANT:  Oh, he's had to come out of

25  retirement and go to work for an insurance company.

```
 1              THE COURT:  Okay.  And you had to spend a lot of
 2    money hiring lawyers, didn't you?
 3              THE DEFENDANT:  Yes, sir.
 4              THE COURT:  Mr. Whalen is a good lawyer.
 5              THE DEFENDANT:  Yes, he is.
 6              THE COURT:  Is your husband going to stay with you?
 7              THE DEFENDANT:  I certainly hope so.  Yes.
 8              THE COURT:  How about -- is your son hanging in
 9    there with you and loves his mother?
10              THE DEFENDANT:  This is terrible -- been bad on my
11    family.
12              THE COURT:  Do you know how much money went through
13    that -- that water thing?  What'd they call it?
14              MR. WHALEN:  EarthWater.
15              THE DEFENDANT:  No, sir.
16              THE COURT:  You know, thousands of people were
17    ripped off in that deal.  People -- poor people that just had
18    a little money, put a little money in here and there, and
19    they lost it all.  Of course it was just a scam.  Those are
20    the people you were running with.  I'm not hold that against
21    you, I'm just saying you -- you jumped in the deep end of the
22    criminal pool.
23         How the heck did you ever get involved with those
24    people?
25              THE DEFENDANT:  I -- a, quote, friend that had been
```

1    begging me to come to work for years.

2             THE COURT:  Some fellah?

3             MR. WHALEN:  That was Mr. Barnes, Your Honor.

4             THE COURT:  What else should I know about you?

5        Are you a good grandmother?

6             THE DEFENDANT:  I'm a very good grandmother.

7             THE COURT:  Are you a good mother to this boy?

8             THE DEFENDANT:  I believe I am.

9             THE COURT:  Is he a criminal?

10       Does he get in trouble?

11            THE DEFENDANT:  No, sir.

12            THE COURT:  What does he do?

13            THE DEFENDANT:  He owns his own business.

14            THE COURT:  What kind of business?

15            THE DEFENDANT:  Roofing.

16            THE COURT:  Oh, good.

17       Hard worker?

18            THE DEFENDANT:  Hard worker.

19            THE COURT:  Doesn't take any money from anybody?

20            THE DEFENDANT:  No.

21            THE COURT:  Has to fight with insurance companies

22   when they say, oh, there's no hail damage on that house?

23       What'd your husband do before he retired?

24            THE DEFENDANT:  He was a teacher at Bishop Lynch

25   High School.

1          THE COURT:  Is that right?

2      Are y'all good Catholics?

3      Or is that just where he taught?

4          THE DEFENDANT:  That's where he taught.

5          THE COURT:  He taught math?

6          THE DEFENDANT:  No.  Entrepreneurship and personal

7  finance.

8          THE COURT:  Personal finance.

9      Apparently you didn't take the course.

10          THE DEFENDANT:  No, I didn't.  But I have since.

11          THE COURT:  Where'd y'all meet?

12          THE DEFENDANT:  We met at a basketball playoff

13  about 20 years ago.

14          THE COURT:  You were married to somebody else at

15  the time?

16          THE DEFENDANT:  No.

17          THE COURT:  Y'all have kids together?

18          THE DEFENDANT:  No, sir.

19      He has two and I have three.

20          THE COURT:  From other marriages?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  And so you went to a basketball playoff

23  and there's this fellow?

24          THE DEFENDANT:  Coach.

25          THE COURT:  He was the coach for one of the teams?

```
 1    Like an AAU tournament or high school tournament?
 2              THE DEFENDANT:  It was high school.
 3              THE COURT:  For Bishop Lynch?
 4              THE DEFENDANT:  Yes.  My son was in --
 5              THE COURT:  Was your husband a basketball player?
 6              THE DEFENDANT:  Yes, sir.
 7              THE COURT:  Where'd he play?
 8              THE DEFENDANT:  At Grand Prairie and TCA.
 9              THE COURT:  He was a Gopher?
10              THE DEFENDANT:  Yes, sir.
11              THE COURT:  And then where?
12              THE DEFENDANT:  TCA.
13              THE DEFENDANT:  A Maverick.
14              THE COURT:  UTA?
15              THE DEFENDANT:  I'm sorry.
16              THE COURT:  He played basketball over there?
17              THE DEFENDANT:  Yes, sir.
18              THE COURT:  Was he any good?
19              THE DEFENDANT:  Very good.
20              THE COURT:  He was?
21              THE DEFENDANT:  He's a very good man.
22              THE COURT:  How old is your husband?
23              THE DEFENDANT:  He will be 70 in February.
24              THE COURT:  We're the same age.  I played at
25    Baylor.  Do you think I could take him?
```

```
 1                THE DEFENDANT:  I don't know.  I'm sure he'd like
 2    to play.
 3                THE COURT:  Is he tall?
 4                THE DEFENDANT:  He's six one.
 5                THE COURT:  I'm sure he could take me.  He could
 6    today for sure.
 7         All right.  You understand how this upended everybody's
 8    life, not just you?
 9                THE DEFENDANT:  Yes, sir.
10                THE COURT:  All these people back there are having
11    to be here to vouch for you, thief.
12                THE DEFENDANT:  And I've also not been able to take
13    care of my mom who lives in Austin, because I've had travel
14    restrictions and it just --
15                THE COURT:  Yeah, whose fault is that?
16                THE DEFENDANT:  Mine.
17                THE COURT:  Okay.  How many grandchildren?
18                THE DEFENDANT:  10 altogether.
19                THE COURT:  Oh, that's sweet.
20                THE DEFENDANT:  All under age 9.
21                THE COURT:  Oh, wow, that's a bunch of little
22    boogers.
23         All right.  Ms. Walters, are you doing this or are you
24    going to make -- make your Mr. Kneller do it again?
25                MS. WALTERS:  I'm going to make Mr. Kneller do it
```

1    again.  He came all the way from Washington so I thought he

2    should actually go ahead and make an argument, since he came.

3             THE COURT:  All right.  Mr. Kneller, help me.

4             MS. WALTERS:  Thank you, Your Honor.

5             MR. KNELLER:  Your Honor, the government is not

6    asking for just a guideline sentence but top end of the

7    guidelines and we think it's justified in this case for a

8    number of reasons.

9         First, the only reason that the defendant is before the

10   court today is because after the indictment was brought the

11   government, the prosecution team, and the postal inspectors

12   that were investigating the case had 10 targets.  The

13   defendant was not one of them.  The defendant was a

14   girlfriend -- or dating one of the targets.  But for her

15   obstructive behavior into the investigation, into this case,

16   she would not be here today.

17        That obstructive behavior, it was blazon, deliberate,

18   and it was sustained.  It was not one instance.  It was not

19   two instances.  But it was instance after instance of her

20   taking it on her own to lie to law enforcement, to show

21   disrespect to law enforcement, to obstruct the government's

22   investigation to aid her codefendant in violating the terms

23   of his release.

24        On the very first day that the defendant became aware of

25   the case against the company, postal inspectors served a

1    search warrant, executed a search warrant at the defendant's

2    place of business, she was there, she was incensed, she was

3    rude to law enforcement and she spoke to three witnesses that

4    were there attempting to persuade them to leave the premises

5    and not speak to the postal inspectors.

6         That same day she transferred $20,000 from a company

7    bank account to her own personal bank account.

8         Following that, the next day, she obtained a cell phone

9    for her codefendant so that he could evade his pretrial

10   release requirements.

11        And the two of them worked together to attempt to

12   defraud a payroll company of $50,000.

13             THE COURT:  Prior to this or after this?  After the

14   original arrest and everything?  After the raid?

15             MR. KNELLER:  After the raid, Your Honor.

16        And, Your Honor, just so it's clear, the record, what

17   I'm referring to as the original indictment is the indictment

18   against the company, the company executives, and some of the

19   promoters and salespeople.  Ms. Degroot was not named in that

20   indictment or the superseding indictment with regard to

21   selling the shares of the company.  All of her conduct that

22   is charged occurred after the postal inspectors showed up at

23   the company to execute a search warrant.  All of that

24   conduct.

25        At many points of time she had the opportunity to stop

1    obstructing, but she took the other choice and decided to go

2    further.

3         She doctored an email in response to a grand jury

4    subpoena.

5         She lied to a postal inspector on a recorded line about

6    what she provided in response to a subpoena.  The postal

7    inspector is here today, but I've provided you what his

8    interactions with the defendant were.

9         I've heard the defendant apologize to the court,

10   apologize generally, but what I've not heard is her apologize

11   to the law enforcement agents, including when they went to

12   execute a search and seizure warrant for her phone.  In that

13   instance she accused law enforcement of harassing her.  And

14   as an agent was speaking to her in a car, she bolted out with

15   the car down the parking lot, nearly striking the inspector

16   with the side mirror of the car.

17             THE COURT:  She was driving the vehicle?

18             MR. KNELLER:  She was driving the vehicle and he

19   had been talking with her.  She claimed she didn't see him.

20   Many other postal inspectors were surprised and thought the

21   inspector speaking with her may have been struck by the side

22   of the car.

23        She -- she then --

24             THE COURT:  So was she doing all this to help this

25   fellow, this other guy?

1    MR. KNELLER:  Well, Your Honor, I can't speak to

2  her personal motives but I can speak to what she personally

3  gained.

4    Following all this she took the payroll stubs that she

5  prodded the payroll company into giving her, took the $20,000

6  that she took from the company after the raid to get a

7  mortgage for a house.  She's now living in that house to this

8  day.

9    In our sentencing memo we provided pictures from the

10  real estate listings.  It's got a pool in the backyard.  It's

11  a nice looking home.  To date the defendant has shown -- or

12  really received no consequences for her -- for her conduct.

13  And we think, therefore, it's justified the government

14  seeking a high end of the guidelines.

15    THE COURT:  Okay. Any response to that, Mr. Whalen?

16    MR. WHALEN:  No, Your Honor.  We trust the court

17  and its wisdom to do what's right.

18    THE COURT:  Have y'all made any restitution at all?

19    MR. WHALEN:  No, we have not at this point, Your

20  Honor.  And that -- and I may -- just to tell the court, we

21  hadn't discussed it, and it's been on me that we hadn't

22  considered doing that ahead of time.

23    THE COURT:  I'm not fussing at you.

24    MR. WHALEN:  It's not that Ms. Degroot isn't taking

25  responsibility and intends to make restitution.

```
 1              THE COURT:  I agree.  She said she did.
 2         I heard all that against you, Ms. Degroot, didn't you?
 3         I mean, you seem like a sweet lady in here, but you
 4    weren't out there, were you?
 5              THE DEFENDANT:  That's not exactly what happened.
 6              THE COURT:  Oh, we want to have a little debate
 7    about it?
 8         I'm willing to have a debate about it, if you want to.
 9              THE DEFENDANT:  No.
10              THE COURT:  I mean, you either did this stuff or
11    you didn't do it.  I don't -- it doesn't matter to me.  I'm
12    going to -- but it makes a difference in what sentence you're
13    going to get.
14         You can't halfway plead guilty in front of me.  There's
15    no halfway, yeah, I did, but these guys really are bad guys,
16    they came in there and they were guns ablazing, treating
17    people terrible.  If that's the way it was, then that's the
18    way it was.  You heard what he said.  Either it happened that
19    way or it didn't.  But it does affect what I'm going to do.
20    You're living in a house that you got with ill-gotten gains.
21         You're living in a house with a pool and you went and
22    got a loan from some of this money?
23              MR. WHALEN:  Just to clarify that the allegation as
24    related to getting the bank loan was stating that she was
25    still employed with the company and earning a certain amount,
```

1    so it wasn't any -- the way I remember the facts was that was

2    the allegation, she had made that statement, which was false.

3              THE COURT:  She wasn't working with that company?

4              MR. WHALEN:  She had resigned and there was no

5    income coming in.

6              THE COURT:  She didn't use any of that cash?

7              MR. KNELLER:  Your Honor, as it's laid out in our

8    sentencing memo, she referenced the exact same amount of

9    money that she had taken from the company, $2,000, as a bonus

10   that she had earned -- I didn't mean to interrupt you.

11

12             THE COURT:  That's all right.

13             MR. KNELLER:  -- as a bonus she had earned from the

14   company that year and she put that on her loan application

15   materials.

16             THE COURT:  Okay.  Is that right?

17             MR. WHALEN:  That's correct, Your Honor.

18             THE COURT:  Okay.  Let me tell you what I'm going

19   to do.

20        Have we got another sentencing date before -- we have

21   after Thanksgiving is next week?

22             THE COURT COORDINATOR:  In two weeks we have a full

23   docket.  I could probably fit her in --

24             THE COURT:  We can take her in the full docket.

25   That's okay.

```
 1        Here's what I want.  I want restitution.  That will
 2   encourage my -- my mercy.  I don't care what the family has
 3   to do.  If they have got to go and all the family come up
 4   with some money, come up with some money.  This is not a
 5   sweet story that I heard from them.
 6        Don't look at me with that fevered brow, ma'am.  You
 7   come up with that $15,000.  Okay?
 8             THE DEFENDANT:  Yes, sir.
 9             THE COURT:  You got two weeks from today.
10        We've got a docket that day, right, Ronnie?
11             THE SECURITY OFFICER:  Yes, sir.
12             THE COURT:  I want them first.  And I'll decide
13   what I'm going to do based upon whether you come up with some
14   money to pay that back.
15        I want it to hurt.  You understand me?
16             THE DEFENDANT:  Yes.
17             THE COURT:  Let me see both lawyers for a second.
18             (Discussion at the record off the record.)
19          (Back in open court in the hearing of the jury.)
20             THE COURT:  All right.  Reset this for two weeks
21   from today.
22        Thank y'all.
23                      (End of proceedings.)
24
25
```

1   **INDEX - SENTENCING**

2
3   **Defendant's Allocution**                                 Page   Line

4                                                                9      17
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3

4        I, PAMELA J. WILSON, CSR, certify that the foregoing is a

5     transcript from the record of the proceedings in the

6     foregoing entitled matter.

7

8

9        I further certify that the transcript fees format comply

10    with those prescribed by the Court and the Judicial

11    Conference of the United States.

12

13

14        This the 22nd day of November, 2022.

15

16

17

18
                                  s/Pamela J. Wilson
19                                _____
                                  PAMELA J. WILSON, RMR, CRR
20                                Official Court Reporter
                                  The Northern District of Texas
21                                     Dallas Division

22

23

24

25